# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

GHU Investors, LLC,                    **CASE NO. 1:21-cv-00510**

        **Plaintiff/Counter-Defendant,**

        **-vs-**                      **JUDGE PAMELA A. BARKER**

**Myocare Holdings, LLC,**

                      **MEMORANDUM OPINION AND**
        **Defendant/Counter-Claimant.**   **ORDER**

Currently pending is Defendant/Counter-Claimant Myocare Holdings, LLC's ("Myocare") Motion for Summary Judgment on Plaintiff/Counter-Defendant GHU Investors, LLC's ("GHU") claims filed on June 8, 2022 ("Myocare's Motion"). (Doc. No. 24.) On July 8, 2022, GHU filed an Opposition to Myocare's Motion ("GHU's Opposition") (Doc. No. 25), to which Myocare replied on July 29, 2022 ("Myocare's Reply") (Doc. No. 27).

For the following reasons, Myocare's Motion is DENIED.

## I. Factual Background

In June 2020, Myocare, as Seller, and GHU, as Buyer, entered into an Asset Purchase and Sale Agreement ("APSA") for a 143-bed licensed and dually Medicare and Medicaid certified skilled nursing facility (the "Facility"). (Doc. No. 24-1.) Under the APSA, GHU was to apply for and assume Myocare's current U.S. Department of Housing and Urban Development ("HUD") Insured Mortgage Loan for the Facility in an amount up to ten million seven hundred thousand dollars ($10,700,000). (*Id.* at § 2.1.1.) Housing & Healthcare Finance, LLC ("HHC Finance"), which according to counsel for Myocare is "a private commercial lender," was the originator of Myocare's

HUD-insured loan.  (Doc. No. 24-4, ¶ 9; Doc. No. 25-1, ¶ 3; Doc. No. 24 at 15.)  The process for an assumption of the private HUD-insured loan is referred to as a Transfer of Physical Assets ("TPA"). (Doc. No. 24-4, ¶ 9; Doc. No. 25 at 3.)  The consummation of the purchase of the Facility was "specifically contingent on HUD's approval of the TPA."  (Doc. No. 24-1, § 9.2.)

Under the Closing provision of the APSA, unless extended by the parties in writing, the purchase and sale of the Facility was to be "consummated on the earlier of December 31, 2020 or within 10 business days of Buyer receiving all necessary government approvals for [] the TPA" and satisfaction of the conditions precedent to the Seller's and Buyer's obligations set forth, respectively, in sections 8 and 9 of the APSA (the "Closing").  (Doc. No. 24-1, § 10.)

The APSA also provided for termination of the agreement in a variety of circumstances, but relevant here is section 13.1(g):

> **13.1    Termination Events**. By notice given prior to or at the Closing, subject to **Section 13.2** this Agreement may be terminated as follows:
>
>     . . .
>
>         (g)    by Seller if the Closing has not occurred (other than by reason of the failure by Seller without cause, as set forth above), on or before December 31, 2020, or such later date as the parties may mutually agree upon, except that if any delay is a result of governmental or regulatory inaction beyond Buyer's reasonable control, Buyer shall be entitled to [] an extension of the Closing in a duration equivalent to any such delay.
>
> **13.2    Effect of Termination**. Each party's right of termination under this **Section 13** is in addition to any other rights it may have under this Agreement or otherwise, and the exercise of such right of termination will not be an election of remedies. If a party terminates this Agreement because one of the conditions precedent to its obligations hereunder has not been satisfied, or if this Agreement is terminated by mutual consent, this Agreement shall become null and void and, without any liability of any party to any other party and the Deposit with interest shall be returned to Buyer; provided, however, that, if this Agreement is terminated because of a material breach of this Agreement by the non-terminating party or because one or more of the conditions to the terminating party's obligations under this Agreement is

not satisfied as a result of the non-terminating party's failure to comply with its obligations under this Agreement, the terminating party's right to pursue all legal remedies will survive such termination unimpaired.

(Doc. No. 24-1, § 13.)

The APSA also included the following Miscellaneous provisions at issue:

> **15.6**  **Reasonable Efforts**. Seller and Buyer shall use their commercially reasonable good faith efforts, and shall cooperate with and assist each other in their efforts, to obtain such consents and approvals of third parties (including, but not limited to, governmental authorities), to the transaction contemplated hereby, and to otherwise perform as may be necessary to effectuate transfer the Property to Buyer in accordance with this Agreement.
>
> . . .
>
> **15.13**  **Time of Essence**. Time is of the essence for each and all of the provisions under this Agreement, provided that each Party shall be permitted to cure any alleged default asserted by any other Party hereunder within ten (10) business days, following written notice of said alleged default.

(Doc. No. 24-1, § 15.)

According to the Declaration of Zachary Rimberg, principal and representative of GHU, immediately after execution of the APSA, "GHU commenced its efforts to obtain the TPA with due diligence."  (Doc. No. 25-1, ¶ 10.)  Rimberg declares that HHC Finance informed GHU that under HUD regulations, only HHC Finance could file the application for the TPA with HUD.  (*Id.* at ¶ 6.)  Indeed, Kathryn McGlinchey, a lawyer engaged by GHU to assist with the regulatory approvals as part of the APSA, cites to Section III, Chapter 7 of HUD's Section 232 Handbook (the "HUD Handbook") in declaring that TPA submissions must be assembled, reviewed, and submitted by HHC Finance, not GHU:

> Submissions herein must be assembled, reviewed for completeness, accuracy and eligibility, and submitted by the Mortgagee/Servicer to ORCF with a recommendation for approval. A checklist of the required application exhibits as well as the instructions for submitting the application is posted on the Section 232 Program website.

3

(Doc. No. 25-3, Section 232 Handbook, Section III, Asset Management, Chapter 7; *see also* Doc. No. 25-2, ¶ 5.)

Rimberg declares that from August through early November 2020, he participated in regular conference calls with GHU's lawyers and HHC Finance's lawyers and representatives. (Doc. No. 25-1, ¶ 11.) According to Rimberg, "HHC Finance's lawyers and representatives repeatedly failed to follow up and perform the actions they committed to complete from week to week." (*Id.*) According to McGlinchey, she too worked from August through October 2020 to collect documents for the TPA application which were provided to HHC Finance or its counsel as requested, communicating with HHC Finance's representatives on a regular basis. (Doc. No. 25-2, ¶ 6.) McGlinchey declares that "HHC Finance was less attentive to the details of what was required to complete the TPA application than [she] expected from [her] prior experience." (*Id.*) McGlinchey states that document requests were made, withdrawn, and then made again, while requests for clarification went answered, and other document requests were made when documents had already been submitted in response, and responsibility for the file changed hands three times within the law firm engaged by HHC Finance. (*Id.*)

Meanwhile, according to the affidavits of Elias Coury, managing member of Myocare, and Mary Louisa L'Hommedieu and Mark McGrievy, attorneys who represented Myocare in the transaction, Myocare's representatives told GHU that Myocare was in arrears on its loan with HHC Finance, and thus, "time was of the essence." (Doc. No. 24-3, ¶ 6; Doc. No. 24-4, ¶ 6; Doc. No. 24-5, ¶ 6.) Both L'Hommedieu and McGrievy aver that GHU unilaterally changed the loan request from a TPA, which is an assumption of Myocare's loan with HHC Finance, to an "A-7" refinance of Myocare's existing loan. (Doc. No. 24-4, ¶ 11; Doc. No. 24-5, ¶ 11.) According to L'Hommedieu

4

and McGrievy, the purchase was no longer a TPA, but a request for a larger loan amount and lower interest rate from HHC Finance that the lender then had to submit for approval to HUD.  (Doc. No. 24-4, ¶ 12; Doc. No. 24-5, ¶ 12.)   L'Hommedieu and McGrievy state that the "A-7 was not contemplated or agreed to in the APSA."  (Doc. No. 24-4, ¶ 11; Doc. No. 24-5, ¶ 11.)

According to Rimberg, on the other hand, Myocare was informed about the A-7 modification as early as August 2020 and Myocare never expressed any concern that including an A-7 modification with the TPA would slow the process or prejudice Myocare in any way.  (Doc. No. 25-1, ¶ 9.)

According to McGlinchey, upon information and belief, GHU had provided HHC Finance's representatives with all of the requested documents and information for the TPA Application by October 2020.  (*Id.* at ¶ 7.)  Then, on or about November 16, 2020, HHC Finance's representatives advised McGlinchey that they were in the process of completing and filing the TPA application with HUD.  (*Id.* at ¶ 8.)  However, according to Coury, L'Hommedieu, and McGrievy, GHU did not provide its completed application to HHC Finance until December 2020.  (Doc. No. 24-3, ¶ 14; Doc. No. 24-4, ¶ 16; Doc. No. 24-5, ¶ 16.)

The parties do not dispute that HHC Finance did not file the TPA application with HUD before December 31, 2020.  The parties agree that the TPA application was filed by HHC Finance with HUD in January of 2021.  (Doc. No. 24-4, ¶ 17; Doc. No. 25-1, ¶ 12.)  Coury states that "Myocare was not copied when the GHU application to HHC Finance was received in December[] 2020 but was told by HHC Finance in early January no GHU application had yet been submitted to HUD."  (Doc. No. 24-3, ¶ 16.)

On February 2, 2021, when the sale still had not yet been closed, Myocare submitted a Notice of Termination of the APSA to GHU.  (*Id.* at ¶ 21; Doc. No. 24-2.)  On February 10, 2021, GHU,

through its attorney, responded to Myocare, stating, among other things, that "due to governmental

inaction beyond Buyer's control . . . Buyer did not obtain HUD's approval for the TPA before

December 31, 2020." (Doc. No. 25-1, PageID # 230.) The letter continues:

> Seller was fully aware of the status of the approval of the TPA as of December 31,
> 2020. The APA provides that Buyer is entitled to an extension of the closing
> equivalent to any delay caused by governmental or regulatory inaction, and does not
> include any payment to Seller, increase in price, or other change to the terms of sale
> set forth in the APA due to such delay.
>
> Accordingly, Buyer was surprised to receive your February 2, 2021 correspondence
> and Seller's invitation to renegotiate the financial terms of the sale. Buyer does not
> anticipate any issues that would prevent HUD approval in due course, and Buyer will
> inform Seller of a Closing Date as soon as Buyer obtains the TPA from HUD. If Seller
> refuses to close at that time, Buyer is prepared to take legal action in this regard,
> including for specific performance and damages. Buyer hereby expressly reserves all
> of its rights and waives none.

(*Id.*)

According to Rimberg, GHU did not a receive a response from Myocare, and GHU filed this

action. (*Id.* at ¶ 15.) Rimberg further states that, upon information and belief, Myocare told HHC

Finance to withdraw the pending TPA application in February 2021. (*Id.* at ¶ 16.)

## II. Procedural History

On March 4, 2021, GHU filed a Complaint in this Court against Myocare alleging Breach of

Contract (Count One) and seeking a Declaratory Judgment (Count Two). (Doc. No. 1.) As to Count

One, GHU alleges that Myocare's failures to use commercially reasonable good faith efforts and to

cooperate and assist in GHU's efforts to obtain the TPA from HUD, in breach of the APSA, delayed

the filing of the TPA application. (Doc. No. 1 at ¶¶ 35-37.) GHU further alleges that Myocare was

not entitled to terminate the APSA and that Myocare's February 2, 2021 Notice of Termination is a

breach and anticipatory repudiation of Myocare's contractual obligations under the APSA. (*Id.* at ¶

42.) As to Count Two, GHU requests a declaration that: (1) Myocare's February 2, 2021 Notice of Termination is not effective under the APSA; (2) the APSA is in full force and effect; and (3) the parties are required to close the transaction once HUD issues the TPA. (*Id.* at ¶ 52.)

On April 11, 2021, Defendant Myocare filed an Answer to the Complaint as well as Counterclaims for Breach of Contract (Count I) and a Declaratory Judgment (Count II). (Doc. No. 11.) As to Count I, Myocare alleges that GHU breached the APSA by failing to make a timely application through HHC Finance to assume the mortgage loan at issue. (*Id.* at ¶ 43.) As to Count II, Myocare requests a declaration that: (1) GHU defaulted on its obligations under the APSA; (2) that the damages caused by GHU's failure to comply with the terms and conditions of the APSA require the Earnest Funds held in escrow be paid to Myocare; and (3) that Myocare effectively terminated the Agreement pursuant to its notice of termination submitted to GHU on February 2, 2021. (*Id.* at ¶ 55.)

On June 8, 2022, Myocare filed a Motion for Summary Judgement as to all of GHU's claims. (Doc. No. 24.) On July 8, 2022, GHU filed an Opposition to Myocare's Motion (Doc. No. 25), to which Myocare replied on July 29, 2022 (Doc. No. 27). Myocare's Motion is now ripe for review.

## III.    Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party." *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th Cir. 2006). "Thus, '[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'"

*Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)) (alteration in original).  A fact is "material . . . only if its resolution might affect the outcome of the suit under the governing substantive law."  *Henderson*, 469 F.3d at 487.

At the summary judgment stage, "[a] court should view the facts and draw all reasonable inferences in favor of the non-moving party."  *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 628 (6th Cir. 2018).  In addition, "the moving party bears the initial burden of showing that there is no genuine dispute of material fact."  *Ask Chems., LP v. Comput. Packages, Inc.*, 593 F. App'x 506, 508 (6th Cir. 2014).  The moving party may satisfy this initial burden by "identifying those parts of the record which demonstrate the absence of any genuine issue of material fact."  *Lindsey v. Whirlpool Corp.*, 295 F. App'x 758, 764 (6th Cir. 2008).  "[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial, the moving party may [also] meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'"  *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  Once the moving party satisfies its burden, "the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a genuine dispute of material fact for trial."  *Ask Chems.*, 593 F. App'x at 508-09.  "[T]he nonmoving party may not simply rely on its pleading, but must 'produce evidence that results in a conflict of material fact to be solved by a jury.'"  *MISC Berhad v. Advanced Polymer Coatings, Inc.*, 101 F. Supp. 3d 731, 736 (N.D. Ohio 2015) (quoting *Cox*, 53 F.3d at 150).

## IV.  Analysis

### A.    Breach of Contract (Count One)

8

In its Motion for Summary Judgment, Myocare moves for judgment with respect to GHU's claim that Myocare breached the APSA when it terminated the APSA.  Myocare argues it properly terminated the APSA pursuant to the plain terms of the APSA, because (1) GHU materially breached the APSA by "fail[ing] to act in a timely fashion to secure a closing by the APSA deadline [of] December 31, 2020 or request[ing] a 30 day extension," as time was of the essence under the APSA; and (2) GHU's inaction or delay was not as a result of any "governmental or regulatory inaction," as HHC Finance is not a governmental or regulatory agency, so Myocare was permitted to terminate the sale under Paragraph 13.1(g) of the APSA.  (Doc. No. 24 at 11-15.)

In support of its argument that GHU materially breached the APSA when it failed to close by December 31, 2020, Myocare submits affidavits from Attorneys L'Hommedieu and McGrievy, who worked on Myocare's (ultimately unsuccessful) sale to GHU.  Both aver that throughout Myocare's negotiations with GHU, Myocare's representatives told GHU that Myocare was in arrears on its loan with HHC Finance, and thus, "time was of the essence."  (Doc. No. 24-3, ¶ 6; Doc. No. 24-4, ¶ 6; Doc. No. 24-5, ¶ 6.)  Indeed, in its brief, Myocare points to section 15.13 of the APSA, the "time of essence" clause, as a demonstration that both parties understood that time was of the essence in this transaction and that Myocare sought to close as soon as possible.

Both L'Hommedieu and McGrievy aver that GHU unilaterally changed the loan request from a TPA, which is an assumption of Myocare's loan with HHC Finance, to an "A-7" refinance of Myocare's existing loan, i.e., a request for a larger loan amount and lower interest rate from HHC Finance.  (Doc. No. 24-4, ¶¶ 11-12; Doc. No. 24-5, ¶¶ 11-12.)  Myocare argues that this change was "done without concern for Myocare that needed the transaction to close as early as possible," and seeking an A-7 refinance "could not have taken a shorter time" than if GHU had stuck with the

9

original loan assumption.  (Doc. No. 24 at 12.)  Thus, Myocare argues that because GHU failed to secure a closing by December 31, 2020, or request a 30-day extension pursuant to section 9.2, Myocare "had every right to terminate the transaction."  (*Id.* at 14.)

Lastly, Myocare argues that it properly terminated the agreement because GHU's inaction or delay was not as a result of any "governmental or regulatory inaction" beyond GHU's reasonable control, as provided for under section 13.1(g) of the APSA.  Myocare argues that because HHC Finance is a private commercial lender, HHC Finance cannot be considered at fault for any "governmental or regulatory inaction."  (Doc. No. 24 at 15.)  In support of this argument, Myocare attaches an affidavit of Susana Araoz, Chief Underwriter and Chief Risk Officer of HHC Finance, who avers that HHC Finance is a privately owned Delaware limited liability company, "not a governmental entity."  (Doc. No. 24-7.)

In its Opposition, GHU argues that Myocare was not entitled to terminate the APSA because the delay in obtaining the TPA was a result of regulatory inaction beyond GHU's reasonable control, as provided in section 13.1(g) of the APSA.  (Doc. No. 25 at 5-7.)

GHU argues that under the plain language of the agreement, "the only possible consequence of not obtaining the TPA by that date was the termination of the Agreement, not a breach by GHU." (Doc. No. 25 at 9.)  According to McGlinchey's declaration (GHU's lawyer in the transaction), GHU provided all documents requested by HHC Finance by October 2020.  (Doc. No. 25-2, ¶ 7.)  And up until that point, both Rimberg, principal of GHU, and McGlinchey participated in regular conference calls between GHU and HHC Finance's lawyers and representatives.  (Doc. No. 25-1, ¶ 11; Doc. No. 25-2, ¶ 6.)   According to Rimberg and McGlinchey, however, HHC Finance's lawyers and representatives failed to follow-up, made duplicative requests, and seemingly fumbled the file

between its lawyers on several occasions.  (Doc. No. 25-1, ¶ 11; Doc. No. 25-2, ¶ 6.)  Thus, GHU argues that any delay that occurred in timely submitting the TPA application to HUD was due to HHC Finance's failures.  (Doc. No. 25 at 6.)

GHU further argues that this delay on HHC Finance's behalf is considered "governmental or regulatory delay" beyond GHU's control.  GHU emphasizes that section 13.1(g) is written in the disjunctive, i.e., "governmental *or* regulatory inaction," and that HHC Finance's delay can be considered regulatory delay beyond GHU's control.  (*Id.* at 7 (emphasis added).)  GHU asserts that HHC Finance's delay in submitting the TPA should be considered regulatory delay because, according to the HUD Handbook, HHC Finance was the only entity in the position to submit the TPA application.  (*Id.* at 6-7.)  Because only HHC Finance, as the seller's HUD-approved lender, was permitted to compile the TPA application and submit it to HUD, GHU argues that HHC Finance "played an essential part in the regulatory process, and its inaction and failure to timely process and submit the TPA application delayed the TPA approval process beyond GHU's reasonable control." (*Id.*)  GHU argues that, at minimum, there are genuine issues of material fact in this regard.  (*Id.*)

In response to Myocare's argument that GHU failed to request an extension under section 9.2 of the APSA, GHU argues that the plain terms of this paragraph do not require GHU to exercise its option to request an extension.  (Doc. No. 25 at 8.)  GHU argues that because the delay in obtaining the TPA was due to regulatory inaction beyond GHU's control, section 13.1(g) governs here, not section 9.2.  (*Id.*)

In response to Myocare's argument regarding the A-7 modification, GHU argues that there is nothing in the APSA that prevents GHU from including an A-7 modification of the loan.  (*Id.*)  Rather, the APSA only requires GHU to "make application" for the TPA with HUD and to "use its best efforts

to secure the approval of the same," which GHU argues it did.  (*Id.* at 8-9.)  Further, based on Rimberg's declaration, Myocare knew of GHU's pursuit of an A-7 modification and did not express any concern over such a modification at the time.  (Doc. No. 25-1, ¶ 9.)  Lastly, GHU argues that Myocare's assumption that an A-7 modification would extend the regulatory approval process is without basis in the record.  (Doc. No. 25 at 9.)  Indeed, GHU argues that there is no evidence in the record that any delay was caused by the A-7 modification.  (*Id.* at 10.)

In its Reply, Myocare argues, without any supporting evidence, that the amount of information required to complete a TPA is substantially less than an A-7 modification.  (Doc. No. 27 at 4.) Further, Myocare argues that GHU could have used a different lender to secure a mortgage, but GHU chose HHC Finance, and in fact, had never complained about any delay on HHC Finance's behalf previously.  (*Id.* at 5-6.)  Myocare also argues that nothing in the HUD Handbook "makes HHC Finance a governmental or regulatory branch of the government."  (*Id.* at 9.)

"Under Ohio law, the elements of a breach of contract claim are: (1) the existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damage or loss to the plaintiff as a result of the breach." *Asset Mgmt. One LLC v. U.S. Bank Nat. Ass'n*, 569 Fed. Appx. 438, 441 (6th Cir. 2014) (quoting *V & M Star Steel v. Centimark Corp.*, 678 F.3d 459, 465 (6th Cir. 2012)).

"[A] material breach of contract is a party's failure to perform an element of the contract that is so fundamental to the contract that the single failure to perform defeats the essential purpose of the contract or makes it impossible for the other party to perform." *Creative Concrete v. D & G Pools*, 2008 WL 2609504, at *3 (Ohio Ct. App. June 26, 2008).  "The determination whether a material breach of an agreement has occurred is generally a question of fact." *Klaus v. Hilb, Rogal & Hamilton*

12

*Co. of* Ohio, 437 F. Supp. 2d 706, 731 (S.D. Ohio 2006) (citing *Kersh v. Montgomery Developmental Ctr.*, 519 N.E.2d 665, 668 (Ohio Ct. App. 1987)).  As an Ohio court has outlined:

> The reasoning behind this principle is that to determine whether a party's breach was material requires, inter alia, an examination of the parties' injuries, whether and how much the injured parties would or could have been compensated, and whether the parties acted in good faith.  All of these inquiries turn on subjective facts.

*O'Brien v. Ohio State Univ.*, 2007 WL 2729077, at *3 (Ohio Ct. App. Sept. 20, 2007) (citation omitted).

Further, "the interpretation of written contract terms, including the determination of whether those terms are ambiguous, is a matter of law for initial determination by the court." *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 763 (6th Cir. 2008); *see Ohio Historical Soc'y v. Gen. Maint. & Eng'g Co.*, 583 N.E.2d 340, 345 (Ohio Ct. App. 1989).  It is the role of the court to discern the intent of the parties, which is "presumed to reside in the language they choose to use in their agreement." *Savedoff,* 524 F.3d at 763 (quoting *Graham v. Drydock Coal Co.*, 667 N.E.2d 949, 952 (Ohio 1996)); *see United States Fid. & Guar. Co. v. St. Elizabeth Med. Ctr.*, 716 N.E.2d 1201, 1208 (Ohio Ct. App. 1998).  "[C]ommon words appearing in a written instrument are to be given their plain and ordinary meaning unless manifest absurdity results or unless some other meaning is clearly intended from the face or overall contents of the instrument." *Alexander v. Buckeye Pipe Line Co*, 374 N.E.2d 146, 150 (Ohio 1978).  "The Court must look to the plain language of the contract, and only go beyond the plain language of the agreement to determine the rights and obligations of the parties if it is ambiguous." *Airlink Commc'ns, Inc. v. Owl Wireless, LLC*, 2011 WL 4376123, at *2 (N.D. Ohio Sept. 20, 2011) (internal citations omitted).

13

"Contractual language is 'ambiguous' only where its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations." *Covington v. Lucia*, 784 N.E.2d 186, 190 (Ohio Ct. App. 2003) (citation omitted); *see also Lager v. Miller-Gonzalez*, 896 N.E.2d 666, 669 (Ohio 2008) ("Ambiguity exists only when a provision at issue is susceptible of more than one reasonable interpretation."); *Sec'y of USAF v. Commemorative Air Force*, 585 F.3d 895, 900 (6th Cir. 2009). "[C]ourts may not use extrinsic evidence to create an ambiguity; rather, the ambiguity must be patent, i.e., apparent on the face of the contract." *Covington*, 784 N.E.2d at 190. In determining whether contractual language is ambiguous, the contract "must be construed as a whole," *Tri-State Group, Inc. v. Ohio Edison Co*., 782 N.E.2d 1240, 1246 (Ohio Ct. App. 2002) (quoting *Equitable Life Ins. Co. of Iowa v. Gerwick*, 197 N.E. 923 926 (Ohio Ct. App. 1934)), so as "to give reasonable effect to every provision in the agreement," *Stone v. Nat'l City Bank*, 665 N.E.2d 746, 752 (Ohio Ct. App. 1995).

The parties do not dispute that GHU did not close the sale with Myocare by December 31, 2020, as required by the contract. Rather, GHU contends that Myocare was not entitled to terminate under section 13.1(g) because GHU's failure to close was due to HHC Finance's "regulatory inaction." Thus, the Court must determine whether there was any such regulatory inaction here.

In accordance with contract interpretation principles, the Court must first look to the plain language of the contract to determine the meaning of the phrase "governmental or regulatory inaction" as set forth in section 13.1(g) of the APSA. The parties disagree on whether any action on HHC Finance's behalf is to be considered "governmental or regulatory inaction." The APSA itself does not define the "governmental or regulatory inaction," and, the parties do not direct this Court's

attention to any other language in the APSA that further explains what those terms were meant to encompass.

In the Court's own review of the four corners of the APSA, the Court determines that the contract as a whole does not shed much light on the definition of the phrase "governmental or regulatory inaction."  The Court located only two contractual provisions that relate to regulatory processes in the APSA.  First, section 3.1 provides:

> **3.1  <u>Legal Authority.</u>** The execution, delivery and performance of this Agreement have been duly authorized by necessary entity-level procedural action of Seller, with full power and authority to conduct its business as it is now conducted. Approval of **Housing and Healthcare Finance, LLC, a Delaware limited liability company, ("FHA Lender")**, HUD and Ohio Department of Health, Ohio Department of Aging, Ohio Department of Medicaid and CMS will be required, which Buyer shall obtain and Seller shall cooperate therewith.

(Doc. No. 24-1, § 3.1 (emphasis added).)  This passage defines HHC Finance as the "FHA Lender." No further reference to the defined term "FHA Lender" is found in the APSA.  However, FHA Lender likely means that HHC Finance is the "Federal Housing Administration Lender," which could mean that the parties contemplated HHC Finance to be part of the governmental and/or regulatory process because GHU was required to obtain "FHA Lender" approval, as well as HUD, Ohio Department of Health, Ohio Department of Aging, Ohio Department of Medicaid, and CMS approvals—all of which appear to be governmental and/or regulatory bodies.  Thus, because the FHA Lender is listed alongside these government agencies, it suggests that the FHA Lender is contemplated to be similar to governmental and/or regulatory bodies.

Second, while section 9.7 includes the word "regulatory," the language does not assist the Court in the interpretation of the phrase "governmental or regulatory inaction" at issue, as that section

15

only suggests that the parties contemplated "regulatory" to include regulatory entities related to patient care and payments.  (Doc. No. 24-1, § 9.7.)

Ultimately, neither section provides any clear definition for the phrase "governmental or regulatory inaction," although both suggest that "regulatory" could relate to many different types of agencies.  The Court finds the phrase "governmental or regulatory inaction" to be susceptible to more than one interpretation.  Thus, the Court must look to extrinsic evidence to attempt to ascertain the definition of "governmental or regulatory inaction."

"Extrinsic evidence is admissible to ascertain the intent of the parties when the contract is unclear or ambiguous, or when circumstances surrounding the agreement give the plain language special meaning."  *Graham*, 667 N.E.2d at 952.  "Extrinsic evidence may indicate 'the circumstances which surrounded the parties at the time [the agreement] was made, the object intended to be accomplished, and the construction which the acts of the parties show they gave to their agreement.'" *LublinSussman Grp. LLP v. Lee*, 107 N.E.3d 724, 728 (Ohio Ct. App. 2018) (quoting *Mosier v. Parry*, 54 N.E. 364 (Ohio 1899)) (alteration in original); *see also Graham*, 667 N.E.2d at 952.  In addition, "[w]hen terms of an agreement are ambiguous, parol evidence may be used to explain the understanding of the parties at the time the agreement was entered into."  *SPG, Inc. v. First St. Dev., LLC*, 64 N.E.3d 340, 349 (Ohio Ct. App. 2016); *see also Phillimore v. Butterbaugh*, 2014 WL 5336507, at *6 (Ohio Ct. App. Oct. 17, 2016).

The only extrinsic evidence Myocare provides in support of its assertion that HHC Finance is not capable of "governmental or regulatory inaction" is the affidavit of Susana Araoz, Chief Underwriter and Chief Risk Officer of HHC Finance.  Araoz avers that HHC Finance is a privately owned Delaware limited liability company, "not a governmental entity."  (Doc. No. 24-7.)  Myocare

16

does not offer any other evidence to support its assertion that HHCF is not a governmental and/or regulatory actor.

GHU, on the other hand, directs the Court's attention to the HUD Handbook. The handbook contains a section describing the purpose of the HUD Handbook:

> This Handbook establishes uniform national standards for applying, underwriting, submitting for approval, closing, managing and servicing mortgages insured or held pursuant to Section 232 of the National Housing Act. Section 232 mortgage insurance is available on mortgages that finance residential healthcare facilities, such as, nursing homes, assisted living facilities and board and care facilities. Eligible mortgages can be for the purchase, refinance, new construction, or substantial rehabilitation – or for a combination of these. . . .
>
> HUD's Office of Healthcare Programs (OHP), and specifically the Office of Residential Care Facilities (ORCF) within OHP, has responsibility for administering the Section 232 mortgage insurance program.

(Doc. No. 25-3, Section I, Chapter I, 1.1.)  The HUD Handbook further discusses "Legal Authority," which reads:

> **Section 232:** The Section 232 Program is authorized by Section 232 of the National Housing Act (12 U.S.C. 1715w), (12 U.S.C. 1715(b)) and 42 U.S.C. 3535.  Statutory authority for the implementation of the Section 232 programs is contained in the basic insuring authority for each of the Section 232 programs.  See the National Housing Act, Sections 223(a)(7), 232, 223(d), 232/223(f), and 241.  Additionally, Section 211 of the National Housing Act authorizes and directs the Secretary to make such rules and regulations as may be necessary to carry out the provisions of the Act. Regulatory authority includes 24 CFR Parts 200, 232 and Section 5.801.

(*Id.* at 1.3.)  Thus, based on the Court's reading of the HUD Handbook, it appears to establish policies and procedures as promulgated by a government agency with statutory authority.

GHU argues that because the Handbook's regulations make the seller's HUD-approved lender responsible for the compilation of the documents for the TPA application and the only party able to file the TPA application through the HUD portal, HHC Finance should be considered part of the regulatory process.  (Doc. No. 25 at 7-8.)  In other words, GHU argues that because HUD regulations

17

specify that lenders like HHC Finance are the *only* parties who can actually file TPA applications through the HUD portal, that HHC Finance's delay in filing the TPA approval is "regulatory delay" under 13.1(g).

Based on the evidence presented, the Court agrees with GHU that there is a material issue of genuine fact as to whether "government and/or regulatory inaction" includes HHC Finance's delay in processing the TPA application.  The HUD Handbook indicates that the Mortgagee/Servicer is responsible for assembling, reviewing, and submitting the TPA application.  (Doc. No. 25-3, Section 232 Handbook, Section III, Asset Management, Chapter 7.)  Here, that servicer was HHC Finance. In other words, the HUD regulations "conscript" an otherwise private entity like HHC Finance into acting as a necessary conduit for the regulatory approval process.  As such, once GHU has submitted its materials to HHC Finance, GHU must rely on HHC Finance to proceed in the regulatory approval process by submitting the TPA for approval.

Still, the APSA also provides that the "governmental or regulatory inaction" must be beyond GHU's control.  The declaration submitted by GHU indicates that GHU submitted its materials to HHC Finance by October 2020, while affidavits submitted by Myocare indicate that HHC Finance did not provide all the required information until December 2020.  (Doc. No. 25-1, ¶ 7; Doc. No. 24-3, ¶ 14; Doc. No. 24-4, ¶ 16; Doc. No. 24-5, ¶ 16.)

In its Reply, Myocare appears to argue that HHC Finance's delay was not beyond GHU's reasonable control because GHU's seeking of a A-7 modification "could not have shortened the application process." (Doc. No. 27 at 7.)  Nevertheless, Myocare also admits that they "do not know for a fact [that the A-7 modification] delayed HHC Finance." (*Id.*)  Myocare's admission that it is unclear whether GHU's requested A-7 modification delayed the governmental or regulatory process

18

dooms Myocare's argument at this stage.  Myocare presents no evidence to indicate that the A-7 modification did, in fact, delay the process.  Myocare does not attempt to argue that GHU intentionally sought to delay the transaction by requesting an A-7 modification.  Moreover, GHU presents some evidence that Myocare was aware of, and did not contest, GHU's A-7 modification request.  (Doc. No. 25-1, ¶ 9.)  Further, neither party presents any evidence from HHC Finance or its employees, indicating one way or the other whether an A-7 modification request would slow down a TPA application.  In fact, Rimberg declares that when GHU discussed obtaining an A-7 modification of HHC Finance's loan, HHC Finance explained that GHU could seek the A-7 modification after the TPA closes from any HUD-insured lender, but the process would move more quickly if GHU sought the modification from HHC Finance.  (*Id.* at ¶ 9.)  GHU thus agreed to seek the A-7 modification from HHC Finance "along with the TPA."  (*Id.* at ¶ 8.)

In consideration of the parties' arguments and supporting evidence, the Court determines that there is a genuine issue of material fact as to whether any governmental or regulatory inaction was beyond GHU's control, including whether GHU's request for an A-7 modification delayed the regulatory approval process.

In conclusion, the phrase "governmental or regulatory inaction" is ambiguous.  GHU presented extrinsic evidence that demonstrates there is a genuine issue of material fact as to whether this phrase includes HHC Finance's alleged delay in filing the TPA application.  Moreover, assuming that "regulatory inaction" includes HHC Finance's failure to file the TPA application by December 31, 2020, there is also a genuine issue of material fact as to whether any "regulatory inaction" was beyond GHU's reasonable control.

19

Lastly, to the extent that Myocare attempts to argue that GHU breached the APSA by failing to provide a request for extension under section 9.2, such an argument fails.  (Doc. No. 24, 13.) Section 9.2, titled "Financing Contingency," reads:

> If Buyer has not obtained approval of the TPA on or before **5:00 P.M. EST on or before December 31, 2020,** Buyer may either terminate this Agreement by providing Seller with written notice of such termination ("Financing Termination Notice") or extend the Closing Date for a period of one month by providing notice to Seller (the "Extension Notice"), at which time the Closing Date shall be automatically extended to such date.

(Doc. No. 24-1, § 9.2.)  Section 9.2 is a subsection under the larger section 9, which is titled "Conditions Precedent to Buyer's Obligations."  Under the plain reading of the contract, section 9 (and its subsections, including subsection 9.2) only informs GHU of its rights and options under the APSA, as further evidenced by the heading referencing the conditions precedent to GHU's obligations.  This provision does not impose any duties on GHU for which Myocare could terminate the agreement if GHU so breached.

It is also unclear whether Myocare asserts a separate argument that, pursuant to section 15.13, the "time of essence" clause, GHU's delay in closing should be viewed as a material breach.  Myocare mentions section 15.13 in its argument, but it is not clear whether Myocare cites to this section as providing a separate ground for Myocare's termination of the contract or if Myocare is simply pointing to section 15.13 to illustrate that both parties fully understood time to be of the essence with respect to closing.  However, assuming that Myocare *does* assert that GHU breached section 15.13, this argument fails.  That section provides that "each Party shall be permitted to cure any alleged default asserted by any other Party hereunder within ten (10) business days, following written notice of said alleged default."  (Doc. No. 24-1, § 15.13.)  Myocare did not provide any evidence that it

20

provided GHU with written notice to cure its default within 10 days of said default.  Indeed, Myocare's evidence clearly demonstrates that Myocare did not contact GHU between December 31, 2020, and February 2, 2021, when it sent the letter of termination.  Therefore, Myocare did not comply with its own obligation to send written notice to GHU under section 15.13 so that provision is not triggered here.

Accordingly, Myocare's Motion with respect to Count One is denied.

### B.    Declaratory Judgment (Count Two)

In its Motion, Myocare also seeks summary judgment on Count Two of GHU's Complaint, which requests a declaration that: (1) Myocare's February 2, 2021 Notice of Termination is not effective under the APSA; (2) the APSA is in full force and effect; and (3) the parties are required to close the transaction once HUD issues the TPA.  (Doc. No. 1 at ¶ 52.)  Because the Court has already determined that there is a genuine issue of material fact as to whether "governmental or regulatory inaction" includes HHC Finance's alleged delay in filing the TPA application, and a genuine issue of material fact as to whether any "regulatory inaction" was beyond GHU's reasonable control, Myocare is likewise not entitled to summary judgment on Count Two of GHU's Complaint.

## V.    Conclusion

For the reasons set forth above, Myocare's Motion for Summary Judgment (Doc. No. 24) is hereby DENIED.

**IT IS SO ORDERED.**

 *s/Pamela A. Barker*
PAMELA A. BARKER

Date: October 4, 2022                    U. S. DISTRICT JUDGE

21